

EXHIBIT "L"

# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

**P.O. Box 1007 • Naples, FL 34106**

**844-974-1870**

**Date:** February 25, 2021

**Report by** Scott L. Turner

**Prepared for:** James T. Thompson, ESQ.
Edelman & Thompson, LLC
3100 Broadway, Suite 1400
Kansas City, Missouri 64111

**Case Caption:** Ralston v. PFG Transco, Inc., et al

**Jurisdiction:** United States District Court, District of North Dakota, Easter Division

**Cause/Case/Docket Number:** 3:20-cv-00236-ARS


**General Information:**

**Date & Time of Crash/Loss:** Friday, July 13, 2018 / 4:00AM

**Location of Crash/Loss:** Highway 2, Eastbound, Nelson County, ND, MM 316.98

**Equipment Involved: Pltf:** 2006 Kymco, Venox 250

      **Def:** 2016 Freightliner Truck Tractor:
        (VIN #1FUJGLD57GLHT0242)
        Coupled to (Probable) 53' Refer Semi-Trailer

**Motor Carrier USDOT Number(s):** 035568

**Motor Carrier Status:** Interstate

**Weather Conditions:** Clear

**Road Surface Conditions:** Dry

**Roadway Material of Construction:** Concrete

**Posted Speed Limit:** 70-MPH

**Natural Lighting Conditions:** Hours of Darkness

**Artificial Lighting Conditions:** None

**PCI of SLTC:** December 8, 2020

## 1.0 Persons and Organizations:

➢ Performance Food Group; PFG Transco, Inc.; et al. (hereinafter "PFG"): PFG is the FMCSA registered Motor Carrier that was in lease of the Ryder CMV that was in their care, custody and control at the time of the subject crash. PFG is the employer of professional CMV driver Eric Shipe (and Brian Coke).

➢ Steven Ralston (hereinafter "Ralston"): Ralston was the operator of the subject motorcycle that was crashed into by PFG's professional CMV driver, Shipe.

➢ Eric Shipe (hereinafter "Shipe"): Shipe is the professional CMV driver that was operating the subject PFG CMV at the time of the subject crash wherein he crashed into the rear of the same direction of travel motorcycle being operated by Ralston in the right-lane of travel.

➢ Brian Coke (hereinafter Coke"): Coke was in the Sleeper Berth and was not a witness to the CMV driver's pre-crash condition, or the actual crash itself. Coke was Shipe's team-driver partner at PFG and personal friend.

➢ Jennifer L. Tipsord (hereinafter "Tipsord"): Tipsord was a Safety Coordinator employed by Motor Carrier and Defendant PFG.

➢ Charles J. Verba (hereinafter "Verba"): Verba was the Recruiting and Safety Manager employed by Motor Carrier and Defendant PFG.

➢ Kyle E. Parrish ( hereinafter "Parrish"): Parrish was a Safety Manager employed by Motor Carrier and Defendant PFG.

➢ Spark A. Counterman (hereinafter "Counterman"): Counterman was the Transportation Manager at and Defendant PFG.

## 2.0 Abbreviations and Acronyms:

➢ USDOT – United States Department of Transportation
➢ 49 CFR – USDOT, Code of Federal Regulations

> ➢ FMCSA – Federal Motor Carrier Safety Administration
> ➢ FMCSR – Federal Motor Carrier Safety Regulations
> ➢ NHTSA – National Highway Traffic Safety Administration
> ➢ ATRI- American Transportation Research Institute
> ➢ CMV – Commercial Motor Vehicle
> ➢ RODS – Record of Duty Status
> ➢ CDL – Commercial Driver's License
> ➢ LTCCS – Large Truck Crash Causation Study
> ➢ FPS – Feet Per Second
> ➢ DDC – Defensive Driver Course (Training)
> ➢ NSC – National Safety Council
> ➢ MM – Mile Marker

## 3.0 General Description:

As a result of inattentive driving; fatigue (sleeping) driving; and/or failing in the application and use of the assured clear distance rule, the CMV operated by Defendant professional CMV driver, Shipe was recklessly caused to crash into the rear of the in forward motion motorcycle being operated by Plaintiff, Ralston of whom was seriously injured.

After the high-speed rear impact of 61 to 62 MPH crashing into the in-motion same direction Kymco motorcycle being operated by Ralston, the motorcycle and Ralston were entrapped underneath the front bumper and *deer buster* front-end grill protection and pushed/dragged until the CMV came to its final rest on the narrow right shoulder.

## 4.0 Assignment:

The undersigned has been requested to examine all of the documents listed in the Document's Reviewed section of this report. Apply the knowledge, experience and education along with standards of care and the FMCSR. Determine if and how the Motor Carrier, PFG and or CMV driver Shipe were causative in anyway whatsoever in terms of FMCSR violations and/or industry standards of care.

## 5.0 Introduction and History:

A two-vehicle crash is caused when two vehicles attempt to occupy the same space at the same time. It is then that a determination, based on physical evidence and witness statements must be made as to which of the two vehicles was the offending vehicle(s), thereby the vehicle that caused the subject crash.

As such, it is further known that crashes result from many contributing factors working together to cause the crash. In other words, the act of the physical crash alone is often not

the sole cause as typically identified by law enforcement that often examine the crash parties' issues of potential or likely causation on the crash scene only. Indirect contributing factors may have taken place hours, days, months or even years prior to the crash.

In the subject crash Shipe crashed into the rear of the motorcycle being operated by Ralston, the entire pre-crash event and sequences were caught on the Motor Carrier, PFG in-cab dash-cam system, the Lytx system. One camera trained on Shipe in the driver's seat of the CMV, and one camera trained on the roadway in front of the CMV, the intended path of travel.

The truck-tractor being operated by professional CMV driver at the time of the subject crash is depicted hereunder, Image #1:



**Image #1**                                                                    **Source: Discovery**

The motorcycle being operated by Ralston was a 2006 Kymco and is depicted hereunder with considerable rear-end damage. Ralston was not properly licensed in terms of a motorcycle endorsement at the time of the collision:



**Image #2**                                                    **Source: Discovery**

The pre-crash video segments are very revealing in terms of how the actual crash occurred due to clear fatigue as stated in the North Dakota Vehicle Crash Report (hereinafter "Crash Report"): *Driver Condition at the Time of the Crash 1 – Asleep or Fatigued* (Bates: PFG 00176). The actual video evidence strongly suggests micro-sleeps

of Shipe, but certainly at a minimum of extreme fatigue as both shuttering eyes and drifting are clearly detected, in addition to no evasive maneuver pre-crash with exception to approximately one-second before impact.

The second part of the puzzle is to examine the CMV driver's history, Motor Carrier's safety performance history, in addition to their collective and/or independent willingness to comply with the Federal Motor Carrier Safety Regulations or the FMCSRs. As stated, one additional point of examination is what did the CMV driver do hours to days before the crash. These are all often direct and/or indirect contributing factors to a crash.

_____

The subject crash occurred on Highway 2 eastbound, a rural region of the State of North Dakota in Nelson County, approximately MM 316.98 (Image #3). The subject crash occurred in the right-lane of two and came to final rest position on the south-side soft right-shoulder.



**Image #3**                                                              **Source: SLTC-PCI**

The two eastbound lanes are delineated by a white center-line skip mark indicating passing is acceptable insofar as passing is safe to do so. The right-lane outer edge is delineated by a solid white line separating the travel lane from the shoulder (south side).

The left-lane's outer-edge is delineated by a solid yellow fogline delineating it from the left-side (north side) soft shoulder. The subject lanes are unprotected from the westbound lanes of travel yet separated by a wide vegetative median. On either side there is a series of rumble strips. The north edge rumble strips are within the yellow fogline while the south edge rumble strips are within inches, near immediately outside of the solid white line.

Although roadway measurements are not of a critical factor in terms of causation and the undersigned's assignment, for informational purposes the lane/shoulder widths were physically measured approximately as follows:

- Far left shoulder (north edge) – None, Soft-Shoulder
- Left-lane of travel – 12 linear feet
- Right-lane of travel – 11 linear feet
- Far right shoulder (south edge) – None, Soft-Shoulder

The unprotected median area separating eastbound from westbound is approximately 42 linear feet-wide and is covered with low profile vegetation and grasses:

The area leading up to the site of the subject crash is a slight incline after coming from a slight decline wherein motorists have a line of sight in excess of one mile  during hours of daylight, and is straight and relatively flat:

LEFT BLANK INTENTIONALLY



**Image #4**                                                        **Source: Google SLTC-PCI**

The white arrow in Image #4 indicates the area in where the 80,000# GVWR CMV operated by PFG, being driven by professional CMV driver and employee, Shipe crashed into the rear of the Kymco motorcycle. After crashing into the motorcycle, Ralston was pushed/pulled under the front bumper of the PFG CMV to final rest.

_____

The Motor Carrier, PFG is registered with the FMCSA under USDOT number 035568, registered under PFG Transco, Inc. (PFG), domiciled out of Lebanon, Tennessee and has reported number of 432 truck-tractors under management and 704 professional CMV drivers under their employment.

PFG is engaged in Interstate Commerce in the transport of articles of cargo such as, but not limited to food commodities and chemicals according to the FMCSA filing. The subject CMV was a 2016 Freightliner truck-tractor coupled to a 53-foot refer semi-trailer. The subject truck-tractor was a Class 8 CMV, coupled with a plus 10,000# semi-trailer requiring a Class A CDL CMV driver.

The 2016 Freightliner truck-tractor is owned by and leased from Ryder Truck Rental to PFG. Ryder has no duty herein as to contributing factors as mechanical issues and/or

failures were not the causative factor to the subject crash. Nor was Ryder acting in the role of *Motor Carrier* or *employer* of Shipe.

Accordingly, any Motor Carrier such as PFG of whom the truck-tractor was leased to by Ryder must ensure the CMVs under their care, custody and control are operated in strict accordance with both the FMCSR, State and local laws and ordinances. For purposes of the subject report of which will incorporate the FMCSR and industry standards of care, the violation written under North Dakota statutes is only addressed in this section.

Professional CMV driver, Shipe was identified as *Unit 1* in the *North Dakota Motor Vehicle Crash Report*, in that report, Shipe was noted as to *Driver Action 1 (Contributing Factors) Operated Motor Vehicle in Reckless or Aggressive Manner.* In addition to the State of North Dakota Motor Vehicle Crash Report, the probable causative actions and/or inactions were as follows, all collectively caused by Shipe's driving in a state of extreme fatigue:

- Failing to maintain directional control of his CMV.
- Failing to observe the assured clear distance rule.
- Operating too fast for conditions.
- Failing to operate a CMV in an attentive manner.
- Failing to operate a CMV in a safe and prudent manner.
- Failing to make safe observation.
- Operating a CMV in a state of following too closely.
- Failing to remove his CMV to a place of safe refuge.

All of the preceding all derive from the point of operating a CMV in a state of extreme fatigue of which had been assessed by the *North Dakota Highway Patrol* (NDHP) as to *Operated Motor Vehicle in Reckless or Aggressive Manner*, as prior stated. In addition, the enforcement personnel stated as to *Driver Condition at the Time of the Crash* as *Asleep or Fatigued*. The Lytx dashcam video proves out both assessments of NDHP of which is the proximate cause to the subject pernicious crash.

The Lytx dashcam is trained on both the CMV driver, Shipe and on the forward intended path of travel, the roadway. In the last approximate second before the crash and the caused failed evasive maneuver triggered an 8-second prior undisputable evidence documenting of what had occurred in the cab of the truck-tractor, more specifically, in the CMV driver's seat occupied by Shipe.

Shipe was traveling at a documented 61 to 62 MPH, or approximately 90-FPS. For the 8-second recording of the event, Shipe was clearly in a quasi-slumber, often referred to as micro-sleeps as his head tilted downward and to the left. The collision avoidance alarm sounded at approximately 1-second before the crash, startling Shipe. The CMV then violently crashed into the motorcycle. Shipe's eyes can be seen as to opening near instantly once startled by the crash collision avoidance alarm, immediately prior to the

9

collision avoidance alarm, Shipe's eyes can be seen as to being closed (see Images #5, #6, and #7 below).

At the point the dashcam activated approximately 8-seconds before the crash, while in a sleeping mode, Shipe travelled an approximate of 630 (90 fps X 7 seconds) linear feet before being started by the collision avoidance alarm warning of the impending crash. That distance of approximately 630 linear feet is an equivalence to 2 and 1/3rd football fields. This data is further broken down hereunder.

It can be further observed of Shipe demonstrating extreme fatigue by not only his eye closure and head positions, but he allowed his CMV to drift to the right just seconds prior to the subject crash into the motorcycle being operated by Ralston.

The following two Images demonstrate the manner in which the CMV clearly was allowed to drift as a result of Shipe's extreme fatigue condition, whereby he was failing to maintain directional control:



**Image #5**                                                                                    **Source: Discovery - Lytx**



**Image #6**                                                                                    **Source: Discovery - Lytx**

Note the two upward arrows in Image #5 and Image #6. Although the drifting of the CMV is much more pronounced in the actual preserved Lytx video footage, it likewise is demonstrated as stated; a failure to maintain directional control of the CMV.

Several other arrows are in the above Image #5 and Image #6. Image #5 depicts Shipe closing in on Ralston, Ralston's taillight (left to right arrow) can be clearly observed at 6.00 seconds or 540 linear feet (90 fps X 6 seconds) before impact and beyond to the beginning of the pre-crash Lytx video documented event recording activation.

In Image #6, at 2.5 seconds before impact it can be noted that Shipe's eyes in all probability are fully closed during a micro-sleep as Shipe's head falls to the left, not looking at the path of travel. At 1-second before impact Shipe's eyes clearly open as he was startled to the sound of his collision avoidance alarm indicating near impact at which time Shipe attempts a left-turn evasive maneuver. In Image #7 below, Shipe's eyes are clearly opened as this Image #7 represents 0.50 seconds prior to collision:



**Image #7**                                                                                      **Source: Discovery - Lytx**

Again, the actual Lytx video footage that can be demonstrated before the Jury depicts a much clearer image of Shipe and his eyes being closed as he both drifts and does not take in or process the red-taillight of Ralston's traversing motorcycle, at various points perhaps at certain points due to the moth to the flame theory.

According to Shipe's team driver Coke, post-crash Shipe stated simply that he did not see Ralston. Clearly, if the motorcycle taillight can be seen with the Lytx dashcam, through the same windshield Shipe was supposed to be looking through, Ralston was easily identifiable to the attentive driver: *Q: "Did Mr. Shipe tell you anything about the accident after the accident happened?" A: "Yes, he did. He - - said that he didn't see him."* (BC: 12/12)

Then Coke goes on to describe how Shipe laid causation due to a bug laden windshield. In the Images #6 and #7, the windshield was somewhat affected by bug splatter; however, certainly not close to enough to completely obscure Ralston's taillight: *Q: "Did Eric say why he didn't see Ralston?" …. A: "Yes. The bugs on the windshield."* (BC: 52/18)

Only an approximate of 30 – 40 minutes prior to the subject crash Shipe had stopped at the Wolf Lake rest area. If Shipe had demonstrated a caring regard for other motorists, namely Ralston, he would have taken that opportunity to clean his windshield if he felt the filth was obscuring his view.

The undersigned, when formerly driving CMVs over the road used to always ensure that there was a spray bottle of Windex and paper towels stowed for such needs to ensure safe CMV operation. It is the professional CMV driver's duty to ensure his/her windshield is kept clean to the extent that they can see through the same. Had Shipe operated in the same manner as the undersigned, this highly probable fabrication of an excuse would not have been an issue whatsoever.

_____

The aforestated failures and/or FMCSA regulatory violations of Shipe and/or the Motor Carrier, PFG, individually and/or collectively will be addressed in the following sections of the subject report.

**6.0 Document Examination:**

There were various documents examined as listed below in "Documents Reviewed" section of this report. Throughout the review process the specific points, testimony and issues of examination are included in this section of the report while they are often applied to industry standards of care and the FMCSR, in combination with the undersigned's years of experience, training and knowledge.

**6.1 Federal Motor Carrier Safety Regulation-**

The Federal Motor Carrier Safety Regulations (FMCSRs) were established by the USDOT in an effort to reduce the number of CMV crashes resulting in injury and/or death involving Commercial Motor Vehicles. Originally, the Motor Carrier safety and enforcement in terms of regulations were governed by the ICC established in 1935. In 1966 the responsibility of Motor Carrier safety and enforcement was transferred to the USDOT, of which was then newly formed. Currently the regulations remain under the executive branch, the USDOT, but are in oversight and enforcement by the FMCSA.

The FMCSA established the regulations to cause for Motor Carriers and/or their professional CMV drivers to comply with a set of regulations that would apply to FMCSA registered Motor Carriers. Such regulations are intended to cause said drivers to comply through safety policies and procedures. The FMCSR's are fully applicable to all Interstate Motor Carriers in commerce and Intrastate according to the adoption by the specific State and/or Commonwealth.

Over the years, the FMCSR's have grown substantially as the FMCSA, industry and academia learned more as to the causative and preventative effects of crashes and incidents involving Motor Carriers, this in addition to new technologies. As such, the regulations currently cover a plethora of areas, all geared towards the safety of the general motoring public, the professional CMV driver(s), and the protection of property.

When CMV drivers or the employer Motor Carriers violate the FMCSRs, the Motor Carrier and/or CMV driver(s) are often issued notices of violation, typically citing the USDOT, 49-CFR, the *Federal Motor Carrier Safety Regulations*.

### 6.1.2 FMCSR General Applicability-

The applicability of the FMCSR is outlined within *FMCSR § 390.3*, and the definitions are found in *FMCSR § 390.5*. Shipe is the CDL-A holder thereby a professional CMV driver of the CMV and is recognized as an *"employee"*, and PFG is the Motor Carrier and is recognized as an *"employer"*.

Professional CMV driver Shipe is regulated by the FMCSRs as Shipe was entrusted with the care, custody, control, operation and under dispatch of a defined Commercial Motor Vehicle (CMV) as defined in *FMCSR § 390.5*.

The subject CMV is registered and utilized on public roadways in Interstate Commerce; therefore, it must be operated in compliance with the applicability of the FMCSRs for Interstate Transport, in addition to the State of North Dakota's motor vehicle codes.

➢ *FMCSR § 390.3 General applicability.*

*(a) The rules in subchapter B of this chapter are applicable to all employers, employees, and commercial motor vehicles that transport property or passengers in interstate commerce.*

*(b) The rules in part 383 of this chapter, Commercial Driver's License Standards; Requirements and Penalties, are applicable to every person who operates a commercial motor vehicle, as defined in § 383.5 of this subchapter, in interstate or intrastate commerce and to all employers of such persons.*

*(e) Knowledge of and compliance with the regulations.*

*(1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter that are applicable to that motor carrier's operations.*

*(2) Every driver and employee involved in motor carrier operations shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter.*

➢ ***FMCSR § 390.5 Definitions***

***Commercial motor vehicle*** *means any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle - (1) Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater;*

***Employee*** *means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle), a mechanic, and a freight handler…*

***Employer*** *means any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it,…*

The FMCSR has entire Parts of the FMCSR that are intended to keep CMV drivers from operating in a state of fatigue, referred as Hours-of-Service, *FMCSR § 395*. It is both the duty of the Motor Carrier and CMV driver to ensure that the CMV driver is not operating in a state of fatigue that may cause micro-sleep events that may cause a crash.

As such, *FMCSR § 395* addresses in specific details as to the hours a CMV driver may operate in Interstate Commerce, and mandate the requirement of such CMV drivers as to breaks, time off, etc. The applicable terminology will be addressed hereunder. However, the overarching regulation within the FMCSR states the following in terms of a CMV driver operating in a state of fatigue and/or being in a state of illness:

➢ ***§ 392.3 Ill or fatigued operator.***

*No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired,*

*through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.*

Operating a CMV in such a state of extreme fatigue as demonstrated in the Lytx dashcam video is the primary duty of the CMV driver, in this case Shipe. However, it is an equal duty of the Motor Carrier simply by the fatigue condition is a prohibited condition of the CMV driver:

➢ *§ 390.11 Motor carrier to require observance of driver regulations.*

*Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

Therefore, by way of Shipe operating his CMV in a condition of clear extreme fatigue, it is the equal prohibition of the Motor Carrier, PFG, it is the same as the Motor Carrier itself is in the driver's seat.

## 6.1.3 FMCSR Required Knowledge-

In the examination, and during the road test phase of the CDL test, the driver must both demonstrate knowledge of various aspects of the FMCSR and a road test. Specifically, the candidate must demonstrate knowledge, but not limited to that of *FMCSR § 383.111* although *§ 383.111* is critical knowledge in the undersigned's opinion.

In this specific regulation that is the basis and foundation for CDL knowledge, it is required by the driver to understand twenty general areas of the "*Required Knowledge*" regulation. These obligatory rules of required knowledge are to be a constant source to a CMV driver's knowledge base. They are as follows:

➢ *§ 383.111 Required Knowledge. (a) All CMV operators must have knowledge of the following 20 general areas:*

1. *Safe Operations Regulations;*
2. *Safe Vehicle Control Systems;*
3. *CMV Safety Control Systems;*
4. *Basic Control;*
5. *Shifting;*

6. *Backing;*
7. *Visual Search;*
8. *Communication;*
9. *Speed Management;*
10. *Space Management;*
11. *Night Operations;*
12. *Extreme Driving Conditions;*
13. *Hazard Perceptions;*
14. *Emergency Maneuvers;*
15. *Skid Control and Recovery;*
16. *Relationship of Cargo to Vehicle Control;*
17. *Vehicle Inspections;*
18. *Hazardous Materials;*
19. *Mountain Driving;*
20. *Fatigue and Awareness*

Irrespective of how long Shipe possessed his CDL, be it a day or 10-years, it is still incumbent upon Shipe to not only know this information, but more importantly, he must apply it to his driving habits and skill sets.

As stated, it is further incumbent upon Shipe's Motor Carrier employer (*§ 390.3*), in this case PFG to ensure their driver/employees are so instructed in the *Required Knowledge.*

In general, as to this specific *Required Knowledge* section, the following coincide with the parts of the *Required Knowledge* that were in all probability not exercised or were in all probability ignored when Shipe was operating the CMV that he was given care, custody, dispatch and control of at the time of the subject crash; entrusted with such care, custody, dispatch and control by his Motor Carrier employer, PFG:

> ➢ *§ 383.111 Required Knowledge (a) All CMV operators must have knowledge of the following 20 general areas:*
>
> *(1) Safe operations regulations. Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396, and 397 of this subchapter, such as:*
>
> *(ii) Procedures for safe vehicle operations;*
>
> *(iii) The effects of fatigue, poor vision, hearing impairment, and general health upon safe commercial motor vehicle operation;*
>
> *(3) CMV safety control systems.*
>
> *(i) Proper use of the motor vehicle's safety system, including lights, horns, side and rear-view mirrors, proper mirror adjustments, fire extinguishers, symptoms of improper operation revealed through instruments, motor vehicle operation characteristics, and diagnosing malfunctions.*

*(ii) CMV drivers must have knowledge of the correct procedures needed to use these safety systems in an emergency situation, e.g., skids and loss of brakes.*

*(4) **Basic control.** The proper procedures for performing various basic maneuvers, including:*

*(ii) Putting the vehicle in motion and stopping;*

*(7) **Visual search.** The importance of proper visual search, and proper visual search methods, including:*

*(i) Seeing ahead and to the sides;*

*(9) **Speed management.** The importance of understanding the effects of speed, including:*

*(i) Speed and stopping distance;*

*(ii) Speed and surface conditions;*

*(iii) Speed and the shape of the road;*

*(iv) Speed and visibility; and*

*(v) Speed and traffic flow.*

*(10) **Space management.** The procedures and techniques for controlling the space around the vehicle, including:*

*(i) The importance of space management;*

*(ii) Space cushions, e.g., controlling space ahead/to the rear;*

*(iv) Space for traffic gaps.*

*(13) **Hazard perceptions.** The basic information on hazard perception and clues for recognition of hazards, including:*

*(i) Road characteristics; and*

*(ii) Road user activities.*

*(14) **Emergency maneuvers.** The basic information concerning when and how to make emergency maneuvers, including:*

*(i) Evasive steering;*

*(ii)Emergency stop;*

*(15) **Skid control and recovery.** The information on the causes and major types of skids, as well as the procedures for recovering from skids.*

*(20) **Fatigue and awareness.** Practices that are important to staying alert and safe while driving, including;*

*(i) Being prepared to drive;*

17

*(ii) What to do when driving to avoid fatigue;*

*(iii) What to do when sleepy while driving; and*

*(iv) What to do when becoming ill while driving.*

Based solely on the crash evidence, had Shipe retained and applied the *FMCSR § 383.111, Required Knowledge* part at the time immediately and moments before the subject crash; the basis and foundation of a driver's CDL license, the subject crash would not have occurred.

The non-application or probable non-application of 10 out of 20 points (50%) of *Required Knowledge* by a professional CMV driver is an extraordinary and abysmal failure of Shipe's performance and is a proximate cause to the subject crash.

**6.4 State of Indiana CDL Manual-**

As is the AAMVA CDL Manual being fully applicable to the driving behaviors of Shipe; likewise, the State of Indiana CDL Manual is fully applicable to Shipe. As such, Shipe had a duty to follow the requirements within the same. Additionally, his Motor Carrier employer, PFG had a duty to cause and/or so instruct Shipe to comply:

> ➢ *§ 390.11 Motor carrier to require observance of driver regulations.*
>
> *Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

In other words, PFG cannot claim to not having the ability to monitor Shipe to ensure he was not operating his CMV in a negligent manner, fatigued or otherwise, it is their duty as a Motor Carrier to ensure whether it's by means of technology such as the on-board Lytx system or by random audits of the driver's RODS while in *driving* duty status.

---

It is identified in both the AAMVA CDL Manual and the State of Indiana CDL Manual, and known by common logic that the path of travel; the front of the CMV is the most vulnerable and dangerous area wherein the most destructive damage may occur should a crash be caused:

➢ *2.7.1 Space Ahead*

> *Of all the space around your vehicle, it is the area ahead of the vehicle—the space you're driving into—that is most important*

At 62-MPH this equates to approximately 90-FPS. Therefore, at that approximate 62-MPH that Shipe was operating his CMV, throughout the approximate 7 pre-collision captured seconds on the Lytx camera, Shipe would have traveled at a minimum of 630 linear feet, or nearly 2 and 1/3rd football fields without being aware of his inattentive condition. This is not counting the moments prior to activation of the Lytx on-board camera system that Shipe was likewise, in all probability operating in a fatigue and/or micro-sleeps condition.

The State of Indiana CDL Manual has very clear warnings on fatigue awareness and remedies to keep the fatigue from becoming a pernicious crash:

➢ *2.11 – Driving at Night*

*2.11.2 – Driver Factors, Warning Signs of Fatigue*

*According to the National Sleep Foundation's Sleep in America poll, 60% of Americans have driven while feeling sleepy and 36% admit to actually having fallen asleep at the wheel in the past year. However, many people cannot tell if or when they are about to fall asleep. Here are some signs that should tell you to stop and rest:*

*Difficulty focusing, frequent blinking or heavy eyelids*

*Yawning repeatedly or rubbing eyes*

*Daydreaming; or wandering/disconnected thoughts*

*Trouble remembering the last few miles driven; missing exits or traffic signs*

*Trouble keeping head up*

*Drifting from your lane, following too closely or hitting a shoulder rumble strip*

*Feeling restless and irritable*

*When you are tired trying to "push on" is far more dangerous than most drivers think. It is a major cause of fatal accidents. If you notice any signs of fatigue, stop driving and go to sleep for the night or take a 15 – 20-minute nap.*

19

Shipe should have been further and/or more effectively trained in the detection of fatigue driving symptoms, not just a reliance by the Motor Carrier on the HOS regulations under the FMCSR to govern his fatigue.

The correlation between the Hours of Service Rules and fatigue are inseparable. A CMV driver must not only know the HOS rules, they too must understand the signs and symptoms of fatigue; HOS is all about fatigue management.

As aforestated, Shipe should have had the benefit of additional HOS/fatigue training in that he, as a professional CMV driver did not even know during his deposition the driving time hours permitted by the FMCSR: *A: "… You are not allowed to drive more than 10 hours in a 14-hour period, …"* (ES: 87/20). The fact of the matter is 11-hours in a 14-hour on-duty period a driver cannot drive beyond 11 cumulative hours.

Shipe took an alternate plan wherein he ignored his onset fatigue, essentially failing as a professional CMV driver, compelled to listen to his body's symptoms of fatigue. In violation of both the FMCSR and the State of Indiana CDL Manual, Shipe pushed on in complete and total disregard of the warning signs where he opted to drive in a manner of reckless endangerment to other motorists, namely Ralston, or any other motorist that came into his path of travel.

Shipe, according to the investigating Trooper Martinez wrote up substantial contributing factors to the subject crash caused by Shipe; the unwillingness to heed and adopt to his physical condition of extreme fatigue:

> ➢ *-SHIPE WAS NEARING THE END OF HIS DRIVE TIME AND COULD HAVE SWITCHED OUT FROM THE DRIVER SEAT WITH HIS CO-DRIVER*
>
> *-SHIPE ADMITTED HE WAS TRYING TO MAXIMIZE HIS DRIVE TIME PRIOR TO HAVING TO PULL OVER*
>
> Plaintiff's Exhibit 27 (Shipe Deposition)

Shipe too in his sworn deposition testimony agreed that fatigued driving, being a violation of the FMCSR and the State of Indiana CDL Manual is a reckless act that clearly endangered the rights, safety and welfare of Ralston: *Q: "And you would agree with me that - - that to drive when you are fatigued and falling asleep in a commercial motor vehicle or any vehicle really, for that matter, would be a reckless act; correct?" A: "Yes, I do."* (ES: 77/9). Shipe further concurred with the admission of trying to maximize his driving hours: *Q: "So you were trying to maximize your hours and get to the stop that you normally would get to; right?" A: "Correct."* (ES: 109/22)

Setting goals of ending one's *driving time* at a certain destination is a dangerous precedence and/or habit for a CMV driver to engage, because it causes a driver to look beyond the fatigue symptoms, pushing on with one goal, reaching the in-mind destination. A driver should only operate in two conditions: within the FMCSR hours of

service and/or when one feels any symptom whatsoever of fatigue; whichever comes first. If onset fatigue begins to set in, immediately the professional CMV driver should find a place of safe refuge irrespective of the hours or minutes remaining on the CMV driver's 11-hour driving time clock.

Shipe carelessly, needlessly and most importantly recklessly endangered the life and safety of Ralston of whom had every right to be where he was at the time of the crash caused by Shipe, simply because Shipe wanted to complete his 11-hours of driving time to maximize revenue earning potential; a profit over safety modus operandi.

Had Shipe listened to his body's extreme fatigue condition, complied with the obligatory requirements in the FMCSR, therefore the State of Indiana CDL Manual (and/or AAMVA), pulled over and allowed Coke to log *on-duty driving* status, the subject crash does not occur; therefore, the subject crash would be considered as to being fully preventable.

### 6.4.1 Following Distance / Reaction Time, and Stopping Distance-

Simply stated, had Shipe's applied the following distance rules and been driving attentively as opposed to fatigued; complied with the assured clear distance rule; and, not been operating too closely, he would have perceived and reacted in a timely manner allowing him to come to a safe slowing speed and/or evasively maneuver around the leading motorcycle of Ralston, without crashing into the same. Had Shipe's complied with the aforestated, the subject crash would not have occurred.

Recognizing the proximate cause to the subject pernicious crash was extreme fatigue driving by Shipe, extreme fatigue driving does not dismiss the other safe CMV driving duties that are owed by Shipe to the motoring public. Here inlays the reasoning for addressing this section: "*Following Distance / Reaction Time and Stopping Distance*".

Had Shipe so much as picked up the latest versions of the State of Indiana CDL Manual, either in person at the State of Indiana motor vehicle agency, or simply searched on-line, he would have understood the duty and risks of the assured clear distance rule and equally important, operating a CMV in a state of extreme fatigue as being prohibited, improper and reckless.

According to multiple sources of evidence, primarily the Lytx dashcam footage, Shipe as a professional CMV driver failed in his duty to properly control his CMV by safely slowing and/or effectively maneuvering his CMV without crashing into the back of Ralston's motorcycle, clearly caused by extreme fatigue driving.

The obvious fatigue causative issue aside, the first step in understanding as to proper following distance is to know the proper stopping distance formulas that are in all CDL manuals across the United States, including the AAMVA CDL Manual.

If a professional CMV driver does not know the formulas for safe following and/or stopping, it is simply impossible to apply them in accordance with the FMCSR and industry standards of care. Of course, the professional CMV driver must be able to identify forward motor vehicles by not driving in an extreme state of fatigue; however, once again, this does not relieve Shipe's from the duty of proper following distance or assured clear distance rules applicability.

Again, for clarity of the duties of a CMV driver, and fatigue driving aside, proper stopping and/or slowing distance is a factor of time, distance and mechanical functionality as air pressure essentially converts to mechanical energy, all issues a CMV driver such as Shipe is expected to know from an obligatory standpoint when operating a CMV with foundation airbrakes.

The CMV driver must allow himself/herself the proper time to perceive the hazard followed by reaction to the hazard. As aforestated, in an 18-wheel CMV, at 62-MPH this distance will be nearly 2.5 football fields in length that would be required to fully stop, especially with an 80,000# GVWR CMV.

To create the optimal amount of distance to fully stop such a CMV, the emphasis must always be on the CMV driver's attention to detail, most importantly, not operating in a state of extreme fatigue. Simply stated, the CMV driver must be on full alert, proceeding with due care and caution, often at a reduced speed than that of which is posted. Further, the CMV driver must always operate his/her CMV in a state of both attention to detail and high alert.

To crash into the rear of a slower moving vehicle such as Ralston's motorcycle of which was clearly recognizable on approach in the Lytx video footage (Image #5, #6, and #7) on a two-lane roadway with little to no other motorists in the area of the crash is unconscionable in terms of inattentive and/or extreme fatigue manner of driving.

The CMV driver must be fully cognizant of other motorists on the roadway, at all times, especially in the path that he/she intends to occupy. A CMV driver must be cognizant of changing conditions ahead of his CMV including slower traveling motor vehicles (motorcycles) and be able to adjust accordingly, even if these changing conditions occur well ahead of the subject CMV as in the subject crash, thus "*Aim High in Steering*" must be applied as the *Smith-System* teaches.

It is therefore the responsibility of the CMV driver to ensure not only proper following distance, but he/she must keep a sharp observation on what is not only going on around their CMV, but must also keep a keen watchful eye on what is going on in front of his/her CMV, as aforestated, the most critical of spaces.

In other words, as previously stated the CMV driver must always "*Aim High in Steering*" (*Key #1* in the *Smith-System* for a good reason); the reason is, what is going on in front of the CMV is considered the most critical of areas around a CMV according to both the

AAMVA CDL Manual and the State of Indiana CDL Manual, not to diminish the importance of the other areas around the CMV.

Proper stopping and/or slowing distance allowance is a function time and distance. Time and distance give the professional CMV driver time to both think and react. The CMV driver must first ensure that he/she is not driving in a state of extreme fatigue and be able to recognize the symptoms and react proactively to those symptoms.

_____

The State of Indiana CDL Manual states the following as to perception/reaction to hard braking to coming to a full and complete stop when and where necessary:

### *2.6.1 – Stopping Distance*

*Perception Distance + Reaction Distance + Braking Distance = Total Stopping Distance*

*__Perception distance__ – The distance your vehicle travels, in ideal conditions; from the time your eyes see a hazard until your brain recognizes it. Keep in mind certain mental and physical conditions can affect your perception distance. It can be affected greatly depending on visibility and the hazard itself. The average perception time for an alert driver is 1¾ seconds. At 55 mph this accounts for 142 feet traveled.*

*__Reaction distance__ – The distance you will continue to travel, in ideal conditions; before you physically hit the brakes, in response to a hazard seen ahead. The average driver has a reaction time of ¾ second to 1 second. At 55 mph this accounts for 61 feet traveled.*

*__Braking distance__ – The distance your vehicle will travel, in ideal conditions; while you are braking. At 55 mph on dry pavement with good brakes, it can take about 216 feet.*

*__Total stopping distance__ – The total minimum distance your vehicle has traveled, in ideal conditions; with everything considered, including perception distance, reaction distance and braking distance, until you can bring your vehicle to a complete stop. At 55 mph, your vehicle will travel a minimum of 419 feet. (See Figure 2.11.)*



**Figure 2.11**

Image #8                                              Source: Indiana CDL Manual

***The Effect of Speed on Stopping Distance —*** *The faster you drive, the greater the impact or striking power of your vehicle. When you double your speed from 20 to 40 mph the impact is four times greater. The braking distance is also four times longer. Triple the speed from 20 to 60 mph and the impact and braking distance is nine times greater. At 60 mph, your stopping distance is greater than the length of a football field. Increase the speed to 80 mph, and the impact and braking distance are 16 times greater than at 20 mph. High speeds greatly increase the severity of crashes and stopping distances. By slowing down, you can reduce braking distance.*

***The Effect of Vehicle Weight on Stopping Distance —*** *The heavier the vehicle, the more work the brakes must do to stop it and the more heat they absorb. The brakes, tires, springs and shock absorbers on heavy vehicles are designed to work best when the vehicle is fully loaded. Empty trucks require greater stopping distances because an empty vehicle has less traction*

It has been determined in a plethora of studies that perception and reaction time – also known as response time – is between one to four seconds, even six seconds in extreme cases. According to the University of Idaho's Geometric Design, Theory and Concepts studies they state the following as to braking reaction time: *"Extensive research has shown that 90% of the driving population can react in 2.5 seconds or less."*

There are variables in consideration as to perception and reaction time, such as, but not limited to: age, fatigue, distractions (such as texting) and physical health. Questionable or

24

poor physical health, fatigue and elderly age are likely to lead to diminished mental acuity and diminished cognitive skills therefore longer periods of perception and naturally reaction time as clearly observed in the Lytx video footage.

Once perception and reaction time estimates have been established one must consider the CMV's mechanical state, speed, weight of the vehicle and lading, in addition the road surface conditions to determine the ability to stop as to distance once actual hard brake application has been made.

The standard perception and reaction time used in accident reconstruction is 1.5 seconds (arguably 1.6 seconds), although the actual perception/reaction time can vary greatly and there are many schools of thought, as aforestated. Therefore, knowing the PFG truck-tractor gave an approximate 1-second collision avoidance audible alarm that startled Shipe from his momentary slumber, Shipe had already crashed into the Ralston motorcycle before being effectively able to react in a positive crash avoidance maneuver.

In terms of mechanical delays, with a foundation airbrake system there exists what is known as a "lag time" that will exist from the point at which the driver applies the hard brake application until such time that the airbrakes actually become fully applied or engaged. This lag time is approximately .5 seconds, or a half-second.

Lag time exists in a foundation airbrake system whereas when the driver applies the service brake treddle, it takes a brief literal split of a second to send the air from the air tank reservoirs to the brake chambers. Once the brake chamber converts the compressed air to mechanical energy thereby pushing out the pushrod causing all other applicable mechanical aspects (S-cam) to become engaged, an approximate of a half of a second has expired.

Therefore, the actual foundation airbrakes had not enough time to be actuated before slamming into the slower traveling motorcycle of Ralston.

Had Shipe been provided the benefit of adequate comprehensive training as to FMCSRs, similar to that of what can be found in the State of Indiana CDL Manual, he would have learned of the proper following distance formula regarding heavy CMVs and the relational aspect as to the absolute need to drive an up to 80,000# CMV in a state of attention without the reckless manner of operating in a state of extreme fatigue.



**Image #9**        **Source: Indiana CDL Manual**

The logical reasoning behind the CDL Manual following distance rules are the required time and distance factors it takes to bring a CMV with foundation airbrakes that are FMCSR compliant, and a CMV driver that is attentive to the task at hand – driving, to a safe controlled stop, or even slowing and/or an effective evasive maneuver.

### 6.5 Hartford 3-D Defensive Driver Training-

Albeit Shipe had been trained twice (Bates: PFG 00642 & PFG 00645) in the PFG Hartford 3-D DDC training, clearly by measuring the proximate causers of the subject crash, Shipe either knew or should have known that operating the CMV in an extreme state of fatigue causing the non-compliance with the assured clear distance rule; and, following too closely was an abysmal failure of any such DDC training including the Hartford 3-D DDC program..

All adequate DDC training programs will have essentially the same components to defensive driving instructional skills, as the Hartford 3-D DDC program compared to the Smith-System. As such, the Smith-System, arguably the gold standard and model DDC training program in the CMV universe, one can look at the 5-Key components of Shipe's

failure to operate his CMV in a defensive manner. If the DDC training program with the necessary components were applied by Shipe on tactics to more safely negotiate CMV operations in general, the subject crash would not have occurred. Shipe being trained in DDC, he then knew better as to operating in a state of fatigue and did not operate the subject CMV in accordance with such instruction.

As an example, leaning on the arguable gold standard, the *Smith-System* trains as to the following methodology. There are five primary key elements in the driver training program. In these five primary key elements, there are sub-elements; they are collectively as follows, the bolded were the failures and/or probable failures of Carroll:

*Key #1:* ***Aim High in Steering***

- ***Eyes lead the vehicle properly.***
- ***Sees and evaluates relevant objects from among distant objects.***
- ***Adjusts eye lead distance to speed.***
- ***Keeps vehicle rolling by adjusting for conditions.***
- *Eyes properly elevated around turns and corners*

*Key #2:* ***Get The Big Picture***

- ***Following distance consistently appropriate for conditions.***
- ***Makes and executes decisions early.***
- ***Avoids being unnecessarily boxed in.***
- ***Speed is neither too fast nor too slow for conditions.***
- *Uses knowledge to make driving smoother and more economical.*

*Key #3:* ***Keep Your Eyes Moving***

- *Scans mirrors frequently.*
- *Scans major and minor intersections before entry.*
- ***Moves eyes at least every two seconds.***
- *Checks mirrors prior to slowing or stopping the vehicle.*
- ***Avoids staring while evaluating relevant objects.***

*Key #4:* ***Leave Yourself an Out***

- ***Maintains proper space around the vehicle.***
- *Adjusts space to avoid unsafe intrusion by other drivers.*
- *When stopped, leaves appropriate space in front of vehicle.*
- ***Consistently selects lanes to minimize danger and maximize space & visibility.***
- ***Keeps up to date with current size and shape of space cushion.***

<u>Key #5:</u> ***Make Sure They See You***

- *Seeks eye contact and communicates when conditions suggest the need.*
- *Effectively times use of turn indicators.*
- *Appropriate speed and communications when changing lanes*
- ***Brakes early to activate brake lights.***
- *Vehicle positioning promotes seeing and being seen.*

<u>Note on Keys #1-#5:</u> Using the Smith-System, arguably the gold standard, all of the **bolded** above primary key elements and sub-elements are bolded as they are either directly or indirectly associated to necessary driving behaviors as preventative actions to the subject crash.

Again, similarly, the Hartford 3-D DDC program has essentially the same main components as the Smith-System DDC training program, 5-Keys to defensive driving:

- ➢ *Be Far Sighted*
- ➢ *Move Your Eyes Continuously*
- ➢ *Take in The Whole Picture*
- ➢ *Maintain a Space Cushion*
- ➢ *The Visibility Response*
- ➢ *Communicate*

In reviewing the entirety of the PFG Hartford 3-D DDC training program, it is clear that Shipe was given the benefit of DDC instruction by PFG; however, failure to stay awake while driving does not allow any driver to apply the instruction of any DDC instructional program.

Shipe either knew or should have known that operating a CMV in a state of extreme fatigue as demonstrated in the Lytx dashcam video was an act or failure to act to ensure that he was not operating an 80,000# GVWR CMV in state of extreme fatigue.

_____

According to ATRI's, *Predicting Truck Crash Involvement* from October 2005, it states the following as to defensive driver type training programs: *"Most directors require that new drivers go through both National Safety Council's Defensive Driving Program and/or Smith System Training"*. According to the Discovery received as listed below, Shipe never received the specific referenced training, not to diminish the Hartford 3-D DDC training, but for certain, had Shipe complied with any manner of effective DDC training, the subject crash would not have occurred.

**6.6 Fatigued Driving and Preventative Technologies-**

NHTSA states for driver prevention of fatigue, *if you drive, avoid driving during the peak sleepiness periods (midnight – 6 a.m. and late afternoon). If you must drive during the peak sleepiness periods, stay vigilant for signs of drowsiness, such as crossing over roadway lines or hitting a rumble strip, especially if you're driving alone.*

However, because CMV team driving hours often run through into the early AM hours as the nature of over-the-road CMV driving, NHTSA's advise cannot always be heeded. However, knowing of this problematic conflict, Motor Carriers may consider the assistance and installing of technologies that assist in keeping drivers from falling into states of fatigue.

One such technology is Eye Alert. Eye Alert's marketing states the following as to how the system can aide in warning drivers of fatigue conditions:

➢ *The Eye Alert™, when Installed on the Dash, Monitors the Eyes of the Driver and Recognizes the Signs of a Tired or Impaired Driver and Sounds a Loud Warning*

*The Highway Safety Group, a Division of LumeWay Products, Inc., announces the release of the Eye Alert EA401 Driver Fatigue Monitor for use by commercial drivers and private citizens. Over 70 percent of rural highway accidents in the United States are single vehicle events. The greatest risk occurs during twilight and nighttime hours, though the number of daylight hour single vehicle accidents is still considerable.*

*The EyeAlert will help prevent a high percentage of these accidents. The Eye Alert focuses entirely on the driver's alertness levels or inattention to the road ahead regardless of time of day or weather conditions. If the driver starts to doze off, or is not paying attention to the road, the Eye Alert gives an immediate, audible alarm warning the driver that they need to pay attention to their driving. The Eye Alert can be easily transferred from vehicle to vehicle. It sits on the dashboard and is ready to use in seconds.*

*How it Works:*

*The Eye Alert is based on an infrared camera combined with sensors that monitor your eye closure rate and duration. When the driver starts exhibiting unsafe patterns, such as eyes closing or the driver not focusing on the road ahead, the Eye Alert sounds an alarm. Moreover, because it monitors the person and not the road, it works regardless of weather or roadway conditions; fog, snow, rain on and off highway. Off highway applications include Maritime, farming, mining, etc. – anywhere a helmsman, or equipment operator is susceptible to fatigue.*

*The Technology:*

*After testing the drowsiness-detection technologies available, today, for use in the Eye Alert, the measurement referred to as "PERCLOS" was found to be the most reliable and valid determination of a driver's alertness level. PERCLOS is the percentage of eyelid closure over the pupil over time and reflects slow eyelid closures ("droops") rather than blinks.*

*The technology used in the Eye Alert has been favorably reviewed by government organizations such as the National Highway and Traffic Safety Agency [NHTSA] and the Department of Transportation.*

*Product Features:*

*• Works in all lighting conditions 24/7*
*• Advanced PERCLOS algorithms.*
*• 4 sensitivity settings allow you to adjust the monitor to suit your environment*
*• Works in all weather and road conditions; fog, snow, rain on or off highway*
*• Compatible with safety, prescription or sunglasses*
*• Overall dimensions including base: 3"h x 3.5"w x 1" deep*

*Actual Driver Chart:*

*This is actual PERCLOS data\* from a truck driver on the PA Turnpike driving between midnight and 4 a.m. Numbers in vertical column represent eye closure. It shows the driver's fatigue level is building over time. Our product uses PERCLOS in real time to warn you before you reach a critical level of fatigue:*

LEFT BLANK INTENTIONALLY



**Image #10**                                                                    **Source: Lumeway**

As a reminder, the subject crash occurred at approximately 4:00AM local time. Depending on the CMV drivers schedule, approximately 15-minutes prior is one of the most problematic eye closure periods while operating a CMV on the PA-Turnpike, demonstrating a severe effect on the circadian rhythm.

In fact, the Large Truck Crash Causation Study (LTCCS) reported that 13 percent of commercial motor vehicle (CMV) drivers were considered to have been fatigued at the time of their crash.

It is for these very reasons that professional CMV drivers must be trained in fatigue recognition and management. Because a CMV driver's HOS are within the legal requirements of the FMCSR § 395.3, does not mean a CMV driver may not succumb to fatigue anyway.

In fact, Shipe was determined to operate in "*maximizing his hours*" through his permitted 11-hour rule of operating his CMV, irrespective of the careless and or extremely reckless manner that fatigue was causing him to operate. Verba supports the assertion of extreme recklessness: *Q: "Okay. We can - - we can certainly agree that it's and extremely reckless act to continue to operate a commercial motor vehicle when you are fatigued and tired and falling asleep; right?" A: "I agree."* (CV: 70/18).

Shipe operated his CMV that he was entrusted with in terms of care, custody, control and dispatch in a careless, wanton and reckless manner, not giving due care and consideration to the motoring public's safety.

31

### 6.6.1 Hours of Service of Shipe-

According to the E-RODS of Shipe, beginning July 10, 2018, Shipe came off a 34-hour restart, refreshing his duty clock at 14:28 hours. Shipe came back on-duty at 14:28 hours on July 10, 2018 (Bates: PFG 00032) then demonstrated no RODS violations that would lead to causing fatigue driving through the time of the crash on July 13, 2018 (Bates: PFG 00035).

### 6.7 Hiring/Retention of Shipe-

In March of 2013 Shipe was operating as a CMV driver for Buchanan Hauling & Rigging where he was terminated after only an approximate of one-year and several months. The reasoning for his termination was "*pointing out*" for speeding in a construction zone of which is very reckless behavior. Apparently Shipe allowed his CDL to lapse after being suspended.

Shipe then apparently reapplied to have his CDL reissued going through the learner permit process beginning June 14, 2016. Shipe was then hired by PFG on June 20, 2016.

This first red flag that PFG should have considered, yet not a disqualifying event was Shipe's speeding through a construction zone of which demonstrates a careless disregard for the rights and safety of others. Speeding is a *Great Weight* condition that should be considered.

When being deposed Verba is asked if he was familiar with *§ 391.25*, he states as to the affirmative *Q: "Take a moment, Mr. Verba - - and I'm going to ask you, are you familiar with Section 391.25?" A: "Yes."* (CV: 18/17). This would logically draw to the conclusion that Verba, the Recruiting and Safety Manager at the Motor Carrier, PFG well knew of the *Great Weight* standard and how it applied in the hiring and/or retention process of a professional CMV driver employee:

> ➢ *§ 391.25 Annual inquiry and review of driving record.*
>
> *(2) The motor carrier must consider the driver's accident record and any evidence that the driver has violated laws governing the operation of motor vehicles, and must give <u>great weight</u> to violations, such as speeding, reckless driving, and operating while under the influence of alcohol or drugs, that indicate that the driver has exhibited a disregard for the safety of the public.*

Then in February 15, 2015, Shipe received a violation for disregarding a stop sign (Bates: PFG 00050), another pre-employment red flag, this violation was listed on his DOT employment application.

In further examining the history of Shipe, even though violations outside of a 3-year window of application do not have to be listed on the application, the Hire Right report demonstrates a prior violation of speeding in 2010 as well as *driving on the left side of the road* (PFG 00161).

Taking the sum total of Shipe's violation history, and considering the *Great Weight* standard in the FMCSR, Shipe by the subjective opinion of the undersigned was an inadequately qualified CMV driver, as opposed to disqualified.

To compound this issue, one can examine the repeat violations of Shipe with only meaningless punishment wherein he is over and over again being caused to surrender his safety bonus: "*Loss of Safety Bonus*" on 6-separate occasions from 9/28/16 to 4/2/18, slightly over 1.33 years.

Some of the violations rose to the level of meeting the *Great Weight* standard such as speeding on 4/1/18 and 6/22/17, in addition to OOS violations concerning *HOS* violations and *Falsification of Logs* violations.

The combined total of these violations give the undersigned enough information to state that Shipe was a negligent hire and/or a negligent retention:

> ➢ **Negligent Hiring and Retention-**
>
> According to a White Paper written by HireRight titled: "*How Can Motor Carriers Reduce Their Potential Liability for Negligent Hiring and Negligent Retention*", the author defines negligent hiring retention as: ***Negligent hiring*** *occurs when an employer hires an incompetent or unfit employee who it knows, or by the exercise of reasonable care should have known, was incompetent or unfit and thereby creates an unreasonable risk of harm to others.*

Then there is the Negligent Retention component:

> ***What is negligent retention?*** *Negligent retention occurs when an employer becomes aware, or should have become aware, of problems with an employee that indicate the employee's incompetence or unfitness to perform his or her job, but the employer takes no action.* Simply stated, Shipe perhaps should not have been hired, but he certainly should not have been retained in a Safety-Sensitive Function for PFG.

A responsible Motor Carrier that was concerned for the rights and safety of others would not consider retaining or hiring an incorrigible CMV driver with such an atrocious safety record as that of Shipe, irrespective of the 3-year applicable history.

To compound the issue is the application process of Shipe wherein he demonstrated inexplicable gaps in his history, a matter that should have been vetted out by the Motor Carrier, most notably, Verba. In addition is the fact of no CMV experience in six-years

before being hired by PFG: *Q: "And in looking at his driving experience, when he applied in 2016, he hadn't been in a CMV for basically six years; right?" A: "According to this, that sounds correct?"* (CV: 41/14)

With all of the aforestated in consideration, even Verba supports the contention and/or opinions of the undersigned as to Shipe should have at a minimum been red flagged, and/or not hired at all, based on the interpretation of his testimonial sworn deposition statements: *Q: "You would agree with me that this in not a stellar driving record, wouldn't you?" A: "I think most of that wasn't in a commercial motor vehicle, but no, it's not."* (CV: 47/20); and: *Q: "... I understand you weren't working, but what you've seen today as we've walked through all of this, the totality of this driver, by the time we get to the speed violation in April of 2018, would you have terminated him? Taking the totality of everything you know of him." A: "It would - - the - - the final decision would have had to have been made by the vice president, Terry Mayer, but I can see a pattern, yes."* (CV: 90/15).

Finally, to solidify the opinion of Verba, he states the following as to Shipe's continued viability in terms then being employed in a *Safety Sensitive Function* in driving a CMV, clearly then thinking of the *Great Weight* standard: *Q: Sure. Based on everything you know of this driver that we've gone over today, from the information at hire, CDL issues, and then how he behaved and acted with some not as serious but some very serious safety violations, by the time you get to another speed violation, a second speed violation - - he's already used his electronic device while driving, he's violated hours of service. By the time you get to this second speed violation in April of 2018, would you have recommended that he be terminated?" A: "I would probably - - I would probably lean in that direction, yes."* (CV: 91/15)

Twice herein referenced were the speeding violations caused by Shipe, to be considered as determining factors that directly are in relation to the *Great Weight* standard. When considering continued retention be it negligent or not of Shipe as a PFG professional CMV driver, one must consider the further testimony of Verba in relation to the back to back speeding violations caused by Shipe: *Q: "And so we have a driver here with multiple suspensions, multiple speeding violations. Some of those speeding violations are in a work zone. Wouldn't you agree that that should raise some concern that you have driver who is - - has a propensity not to abide by traffic safety laws?" A: "Yes."* (CV: 49/7); and: *Q: "Then if we can go to April 2nd, 2018, which is page 1 of the exhibit, PFG 512. That's another speeding violation; right?" A: "It appears to be, yes."* (CV: 89/19); lastly: *Q: "But it's certainly an MVR that would cause you concern; correct?" A: "Yes."* (CV: 49/23)

Without fully falling on the proverbial sword, even Counterman states as to having regrets concerning Shipe: *Q: "Hindsight's 20/20. Do you wish you had terminated him prior to this incident?" A: "I wish we could have gotten through to him a little better than what we did?"* (SC: 92/19). The sum total of all parties of concern as to Shippe being an incorrigible CMV driver are just that, he was incorrigible, and that opinion is shared by the undersigned.

34

The aforestated testimonies of Verba, the former Recruiting and Safety Manager at PFG, and Counterman, the Transportation Manager at PFG strongly suggest as to an at minimum of Shipe being a negligent retention, and in all probability a negligent hire based on the *Great Weight* standard. This likewise further comports with the undersigned's opinions.

There is a clear difference between the FMCSR definitions of *qualified* as opposed to *disqualified*, by definition Shipe was *qualified* once he received his CDL; however, there is the subjective term of "unqualified" as often referenced by the undersigned when appropriate. Accordingly, both Verba and Counterman clearly lean in the direction of Shipe being unqualified, considering the subjective opinions.

Had either Verba and/or Counterman reacted upon what is clearly suggested as to Shipe being or having become "unqualified" and terminated him or possibly never having hired him in the first place, the subject pernicious crash would never have occurred. Thereby meeting the very definition of *negligent hire* and/or *negligent retention*.

### 6.8 Controlled Substance and Alcohol Post-Crash-

According to the FMCSR concerning post-crash drug screening and/or alcohol, PFG had a duty make certain that Shipe was timely tested to be in compliance with the FMCSR. Most importantly, to ensure that the Motor Carrier did not have a CMV driving that was intoxicated by drugs or alcohol as an aggravating factor to the subject crash: *Q: "Based on the nature of this accident, would you agree with me that it was - - there was mandatory drug testing that needed to take place pursuant to the Federal Motor Carrier Safety Administration's regulation?" A: "Yes." Q: "Do you know if Mr. Shipe was tested after this accident?" A: "I do not know."* (SC: 26/6)

The applicable FMCSR that mandates as to a Motor Carrier's duty to have the appropriate Controlled Substance and Alcohol testing done is *FMCSR § 382.303*.

Other than Shipe's testimony, there exists no evidence or Discovery reviewed by the undersigned that Shipe was Controlled Substance and Alcohol tested, post-crash within the mandated time frames within the regulation; 2-hours for alcohol and 32-hours for Controlled Substance as his CMV continued on with the route post-crash: *Q: "So you would agree with me that on several points, the accident and collision with Ralston triggered mandatory testing under the Federal Motor Carrier Safety Administration's regulations; correct?" A: "Yes." Q: "and there's really no - - I know you said, "Every" - - "Every situation is different", but when those triggers are hit, there's no discretion for PFG Transco. They have to act consistent with the regulations on testing. Right?" A: "Correct."* (SC: 28/1)

In accordance with the FMCSR, it is the duty of the Motor Carrier to facilitate the proper post-crash alcohol screening within the prescribed timeframe as established by the *FMCSR § 382.303(a)* to ensure that the CMV driver was not intoxicated or hung-over at the time of the crash:

➢ *§ 382.303 Post-accident testing.*

*(a) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for alcohol for each of its surviving drivers:*

*(1) Who was performing safety-sensitive functions with respect to the vehicle, if the accident involved the loss of human life; or*

*(2) Who receives a citation within 8 hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:*

*(i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or*

*(ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.*

*(b) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for controlled substances for each of its surviving drivers:*

*(1) Who was performing safety-sensitive functions with respect to the vehicle, if the accident involved the loss of human life; or*

*(2) Who receives a citation within thirty-two hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:*

*(i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or*

*(ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.*

*(c) The following table notes when a post-accident test is required to be conducted by paragraphs (a)(1), (a)(2), (b)(1), and (b)(2) of this section:*

*(d)(1) Alcohol tests. If a test required by this section is not administered within two hours following the accident, the employer shall prepare and maintain on file a record stating the reasons the test was not promptly administered. If a test required by this section is not administered within eight hours following the accident, the employer shall cease attempts to administer an alcohol test and shall prepare and maintain the same record. Records shall be submitted to the FMCSA upon request.*

A Motor Carrier as sophisticated as PFG either knew and/or should have known of the requirement to have Shipe tested post-crash. If a Motor Carrier does not have such a post-crash Controlled Substance and Alcohol test performed as required, it leads one to believe that either the Motor Carrier acted in an ignorant and/or negligent manner regarding the FMCSR; or, the Motor Carrier is attempting to be covert for unknown but suspected reasoning.

**6.9 Shipe's Pattern of Careless Disregard-**

There are a number of past moving violations that Shipe has been penalized by law due to his careless disregard for other motorist, such as speeding, even through a construction zone where vulnerable road users (construction workers) are abound.

As if that were not bad enough, Shipe, in clear willful violation of the FMCSR and company policy chose to utilize a handheld device while operating a CMV, a significantly dangerous act: *Q: "Do you see where he gets an electronic violation based on a dash cam that appears that he's looking at an electronic device?" A: "Yes." Q: "Okay. And I said that's an extremely serious violation. You would agree that that's an extremely serious violation pursuant to the Federal Motor Carrier Safety Administration's regulations, wouldn't you?" A: "How do you mean by "extremely serious"?" Sure. The feds take it very seriously. They fine a driver $2,750 and a company, if culpable, $11,000, and the second offense the driver's disqualified. Wouldn't you characterize that as pretty serious?" A: "I believe it's serious for anybody driving any vehicle."* (SC: 56/20).

While the undersigned is in complete agreement with Counterman in that cell phone usage is dangerous for any motorist, it is compounded as to the critical nature due to the disparity in weight being approximately 20-times heavier wherein a car may weigh 4,000 pounds, and a fully loaded CMV may be weight rated to transport up to 80,000 GVWR. This is in Addition to stopping distances and the fact of the specialized training of a professional CMV driver and the regulatory burden of the FMCSR that is not applicable to a passenger car, or a motorcycle that is significantly lighter than a passenger car.

It is for these very reasons that National Transportation Safety Board (NTSB) recognizes the weight disparity, CMV driver training and overall duty of care that requires a

professional CMV driver to operate a CMV on a higher plane of awareness and safety; therefore, a higher standard of care.

The NTSB recommends safe practices to the FMCSA and PHMSA after investigating significant transportation related disasters such as the CMV crash in Kentucky that killed eleven persons in 2010 due to the CMV drivers cell phone distraction.

FMCSA and/or PHMSA then consider regulations through legislation using some of NTSB's recommendations. As a result, in part of this particular crash event in Kentucky, the recommendations from the NTSB caused regulations to be imposed on January 3rd, 2012 restricting the use of hand-held cell phones while driving a CMV in interstate commerce.

Based on the plethora of CMV crashes investigated by the NTSB, Chairwoman Hersman stated the following regarding "professional drivers" on July 12th, 2010:

> ➢  *"Truck drivers are held to a higher standard than the average driver and need to address safety issues accordingly."* And, *"They are professional drivers, and the standard of care and the level of expectations for them and their performance are higher."*

Special licensing of a CDL is required of a CMV driver. In most events, such licensing is achieved by attending a Commercial Motor Vehicle driving school that can last for up to a month or better, because it is a special skillset.

This special CDL licensing is in and of itself a clear demonstration wherein *the level of expectations for them and their performance are higher*, as stated by Hersman.

### 6.10 Preventability-

With respect to preventability, the FMCSA has specific language in the determination process when considering preventability. Definitions of preventability largely point to what the CMV driver did or did not do to prevent himself/herself from becoming a party to a crash.

In deposition, even Counterman is in agreement in that the crash was a *preventable accident* if Shipe was operating his CMV in a controlled and attentive manner: *Q: "And would you agree that if Mr. Shipe had been paying attention to the roadway in front of him, he clearly would have had enough time to get around the bike?" A: "Yes."* (SC: 107/2)

In terms of defining preventability, the FMCSR states the following as to Part *§ 385, Appendix A*:

> *"If a driver, who exercises normal judgment and foresight, could have foreseen the possibility of the accident that in fact occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable.*

Furthermore, in the definition section of Part § 385.3, a preventable accident is defined as such:

> *§ 385.3 Definitions and acronyms.*
>
> *Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver.*

The simple fact is that Shipe was driving in a state of extreme fatigue; therefore, driving inattentively in an area of significant and unencumbered lane maneuverability of which he could have safely maneuvered in avoidance of Ralston had he been driving attentively.

Verba, the former Recruiting and Safety Manager at PFG concurs that Shipe's crash was a *preventable accident*: Q: *"Based on you being manager of safety and reviewing dash cam videos and reviewing accidents and, as you put in Linkedin, you - - you very often were responsible for determining preventable/nonpreventable nature of an accident, you would agree with me that this was a preventable accident as it relates to Mr. Shipe; right?"* A: *"Yeah, it looks preventable, yes."* (CV: 67/18)

When Shipe had several opportunities to pull his CMV to a place of safe refuge such as at the Petersburg exit where there are a number of places such as large Ag businesses, 5-miles prior to the crash location. Alternately at the Tesoro truck-stop, 12-miles prior off the Michigan exit; or, the Lakota exit at the Cenex truck-stop, 23-miles prior, he failed to do so. Therefore, Shipe's failure to pull his CMV to a place of safe refuge is an issue of which was fully preventable by definition of *an act, or failure to act* by Shipe.

As aforestated (necessarily redundant), a CMV driver operating his/her CMV in a state of fatigue is a violation of *FMCSR § 392.3*:

> *§ 392.3 Ill or fatigued operator.*
>
> *No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section,*

*the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.*

Being that it is a violation of the FMCSR as to being a driver prohibition, it is therefore likewise a violation and prohibition of the Motor Carrier, in accordance with FMCSR § 390.11:

> ➤ *§ 390.11 Motor carrier to require observance of driver regulations.*
>
> *Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

––––––––––––––––––––––––––

The NSC states the following as to preventability in their Fourth Edition of the Motor Fleet Safety Manual:

> ➤ *"If the driver did everything that reasonably could have been done to prevent the accident and it still happened, then it is graded nonpreventable. If the driver did not do everything reasonable, the accident is considered preventable."*

Again, based on the foregoing, it is clear that Shipe did not operate his CMV in a reasonable and safe manner in accordance with the FMCSR or the State of Indiana CDL Manual, he had options when he in all probability was feeling in a state of fatigue only 5, 12 or 23-miles prior at the respective exits, 2 of which had large CMV parking accommodations.

NSC further states the following in their *Guide to Determine Motor Vehicle Accident Preventability*, strictly in the determination of preventability as to rear-end ("front-end") crashes:

> ➤ **Front-end Collisions** – *Regardless of the abrupt or unexpected stop of the vehicle ahead, a professional driver can prevent front-end collisions by maintaining a safe following distance at all times. This includes being prepared for possible obstructions in the highway, either in plain view or hidden by the crest of a hill or the curve of a roadway.*

––––––––––––––––––––––––––

NATMI defines the preventability of an accident as such:

> ➤ *"One in which the driver failed to do everything that could be reasonably expected to be done to prevent it."*

Not only did Shipe not do everything that should be reasonably expected of a professional CMV driver to prevent the subject crash, he fully contributed and caused it in his careless and inattentive driving mannerisms, allowing himself to operate his CMV in an extreme state of fatigue.

Based on the fact of the crash and the Lytx dashcam video, and how the crash occurred, the crash was fully preventable had Shipe been operating in a non-fatigue manner of which was the proximate cause as to the failure to apply proper following distance and the assured clear distance rule as required both by the FMCSR and the State of Indiana CDL Manual.

Had the appropriate and prescribed following distance and assured clear distance rule been applied, of which clearly were not, caused by extreme fatigue driving, the subject crash would not have occurred.

### 6.9 Higher Standard-

According to ATA's Transport Topics, the trucking industries leading weekly industry newspaper, then NTSB Chairwoman weighed in on her thoughts as to the NTSB's position on CMV drivers being held to a higher standard of care than that of a private motor vehicle:

*Beyond technology and addressing fatigue, Hersman said truck drivers are held to a higher standard than the average driver, and they need to address safety issues accordingly.*

*"What people in the trucking industry need to realize is they are professionals," she said. "They are professional drivers, and the standard of care and the level of expectations for them and their performance are higher."*

Based on a professional CMV driver's training and *Required Knowledge* in terms of operating a CMV, the professional CMV driver is by definition held to a higher standard than that of the standard licensed motor vehicle operator, although all drivers have a duty to follow the rules of the road.

## 7.0 Opinions:

Based upon the foregoing analysis, as a Commercial Motor Vehicle expert possessing approximately 30 years-experience in the Transportation Industry and based upon what is good and safe practices in the Transportation Industry, I have come to form the following opinions as to the crash that caused injury to Plaintiff which occurred on Highway 2 eastbound, a rural region of the State of North Dakota in Nelson County, approximately MM 316.98.

I express these opinions with a reasonable degree of certainty and probability:

1. It is the undersigned's opinion that driving in a state of extreme fatigue that was the proximate cause to inattentive driving; following too closely; and, failing to apply the assured clear distance rule were all contributing factors to the subject crash.

2. It is the undersigned's opinion that had Shipe adequately managed his fatigued condition by removing himself and the CMV that he was entrusted with the care, custody and control from the roadway at prior exit opportunities, the subject crash would not have occurred.

3. It is the undersigned's that based solely on the pre-crash Lytx dashcam video evidence, had Shipe retained and applied the *FMCSR § 383.111, Required Knowledge* part at the time of and moments prior to the subject crash; the basis and foundation of a driver's CDL license, the subject crash would not have occurred.

4. It is the undersigned's opinion that the non-application of 10 out of 20 points (50%) of the *Required Knowledge* (*FMCSR § 383.111*) by a professional CMV driver is an extraordinary failure of Shipe's performance and are collective proximate causers to the subject crash.

5. It is the undersigned's opinion that Shipe failed in his duty to understand and appreciate the FMCSR and as to how it applied to his driving discipline.

6. It is the undersigned's opinion that PFG failed in their duty to cause Shipe to understand the then current FMCSR and State of North Dakota law regarding fatigue caused inattentive driving and as to how it applied to his driving discipline.

7. It is the undersigned's opinion that PFG failed in their duty to ensure that Shipe was not operating his CMV in a manner of a *reckless or aggressive manner* as cited in the State of North Dakota Motor Vehicle Crash Report (Bates: PFG 00175.

8. It is the undersigned's opinion that PFG exhibited recklessness in continuing to employ and/or retain Shipe after April of 2018 given his prior driving history in conjunction with his known history of continued unsafe driving practices evidenced by his Lytx dashcam (e.g. speeding and electronic device violations).

9.  It is the undersigned's opinion that if Shipe were trained and/or refresher trained in proper fatigue recognition and fatigue management and if he applied the same on the early morning pre-crash hours, the subject crash would not have occurred.

10. It is the undersigned's opinion that Shipe had the last best clear chance to prevent the subject crash from occurring, if he had been driving in a non-fatigued and alert manner; complied with the assured clear distance rule; effectively made a safe lane change well prior to the crash; and, not following too closely, the subject crash would not have occurred.

11. It is the undersigned's opinion that PFG shares in the equal duty as to the prohibition of operating a CMV in a fatigue manner as the prohibition of such driving is imposed on their professional CMV driver, Shipe, in the same manner by the FMCSR.

12. It is the undersigned's opinion that extreme fatigue driving by Shipe caused inattentive driving that was a proximate cause to a lessened time span of perception and reaction by Shipe, thereby causing an ineffective evasive maneuver(s) due to substantially shortened time and distance caused by the inattentive driving by Shipe, approximately 1-second from the startling crash avoidance alarm tone.

**Note:** The afore listed opinions are in addition to the main body of the preceding report, of which are likewise to be considered additional to the undersigned's opinions and expressed to a reasonable degree of professional probability.

**<u>Documents Reviewed:</u>**

- Deposition Transcript of Eric N. Shipe, w/ Exhibits
- Deposition Transcript of Tipsord, w/ Exhibits
- Deposition Transcript of Ralston, w/ Exhibits
- Deposition Transcript of Coke, w/ Exhibits
- Deposition Transcript of Verba, w/ Exhibits
- Deposition Transcript of Parrish, w/ Exhibits
- Deposition Transcript of Counterman, w/ Exhibits
- North Dakota Motor Vehicle Crash Report
- Lytx Dashcam Pre/Post-Crash Video
- Bates: PFG 00001 – 00715
- Complaint
- Defendant's Initial Disclosures
- PFG Response to Request for Disclosures
- PFG Answers to Interrogatories
- NDHP MCSAP Post-Crash Inspection
- Background Results from MyCase – Shipe
- Preliminary Background Check – Shipe

- Defendant's Motion to Strike
- Defendant's Brief in Support of Motion to Strike
- Various News Articles
- Prior Litigation Cases Against PFG (16)
- Photographs from SLTC Crash-Site PCI: 12/8/20
- Various Arrest Records/Documents of Shipe

**References:**

- Federal Motor Carrier Safety Regulation: § 383.111; § 385; § 392.2; § 390.3; § 395.3; § 392.82; § 391.15; § 390.11; § 385 Appendix A
- LTTCS
- USDOT-NHTSA: Speed Enforcement Program Guidelines, March 2008
- NSC, Motor Fleet Safety Manual, Fourth Edition (page 110)
- NSC, A Guide to Determine Motor Vehicle Accident Preventability (page 13)
- NATMI – Motor Fleet Safety Supervisor - (page 15-1).
- NHTSA – Drowsy Driving
- ATA; Transport Topics (7/12/10 Issue)
- State of Indiana CDL Manual
- HireRight – How Can Motor Carriers Reduce Their Potential Liability for Negligent Hiring and Negligent Retention
- University of Idaho's Geometric Design, Theory and Concepts US Naval
- Smith-System, Instructor Training Manual
- LumeWay – Eye Alert™
- Black's Law Dictionary; Ninth Edition

**As the sole author of this report, I reserve the right to change or amend my conclusions and opinions based on information that was not available to me at the time of this report writing. Should the need for such changes or amendments be necessary I will submit the same to the retaining counsel of this report.**

**Reported by:**

**Scott L. Turner**
**President**